GARCÍA, PLAINTIFF AND APPELLEE, *v.* HUMACAO FRUIT COMPANY, DEFENDANT AND APPELLANT.

APPEAL from the District Court of Humacao in an Action of Debt.

No. 1580.—Decided July 24, 1917.

DEBT—ATTACHMENT—CUSTODY OF PROPERTY—AGENT.—In levying an attachment on personal property the attaching officer cannot constitute the debtor his agent to keep the chattels attached, and if, in the absence of a special statutory provision, he leave such property with the debtor, the attachment is dissolved.

ID.—ID.—LEVY—RECORD IN REGISTRY.—Our statute provides that in order to make a levy on real property it shall not be necessary for the officer to go upon the ground, but it shall be sufficient for him to endorse such levy on the writ and send a copy of said writ, with the endorsement thereon, to the registrar of property of the district wherein the property is situated, to be noted in the registry; and it is a well-established rule that where there is a special statutory provision respecting the manner in which a levy of an attachment shall be made it must be strictly observed.

ID.—ID.—EXECUTION SALE—INADEQUACY OF PRICE—FRAUD.—A sale under execution is not void merely because the price paid for the property sold is inadequate, except, possibly, when so grossly inadequate as to create a presumption of fraud; but where the price is inadequate, slight additional circumstances may be sufficient to induce the court to set the sale aside.

The facts are stated in the opinion.
*Mr. Juan B. Huyke* for the appellant.
The appellee did not appear.

MR. JUSTICE HUTCHISON delivered the opinion of the court.

On March 26, 1912, in a suit by Florencio García Lebrón, appellee herein, against the Humacao Fruit Company, appellant, hereinafter referred to as the company, the marshal

of the Municipal Court of Humacao attached one out of a
number of mules found on the premises of the company.
The mule, true to the best traditions of the species, appar-
ently resenting the threatened severance of social relations
and forcible transportation from the surroundings to which
it had become accustomed, openly defied the mandate of the
law and firmly declined to accompany the officer, who, after
consultation with the attaching creditor and at the suggestion
of the latter, finally acquiesced in such refusal and left the
refractory hybrid where he had found it, in the possession
of an employee of the company. Apparently it did not occur
either to plaintiff or to the marshal that the property so at-
tached might thereafter change its mind about leaving the
premises. In any event no receipt was taken and the mule,
together with the others, upon which no levy had been at-
tempted, was subsequently removed, without any unnecessary
formalities, to another neighborhood.

About a year and a half later a judgment by default for
$86.63, together with interest and costs, was rendered against
the defendant company and execution issued. The writ was
returned by the marshal with a somewhat carelessly worded
endorsement which for the purposes of this opinion may be
accepted as a statement that he had levied upon 16½ *cuerdas*
of real estate described therein, conclusively shown by the
testimony hereinafter mentioned to be worth from $1,200 to
$1,500. This parcel of land was sold for $130 and the present
appeal is from an order refusing to set aside the sale.

Among the numerous questions raised by the company in
the court below, we need consider only the matter of inade-
quacy of price in connection with our own view of the conse-
quences flowing from the action of the marshal in releasing
the personal property first seized by him and of the manner
in which the second levy was made.

Aside from the undisputed fact as to the value of the
property the testimony on both sides is so meagre, vague
and unsatisfactory that neither of the parties could very

well complain if the whole were brushed aside as unworthy
of serious consideration. Indeed, the case of appellee would
have been much stronger had he relied solely and exclusively
upon the written return endorsed upon the writ of execution,
in so far as the fact of the second levy is concerned; an item
of documentary evidence the probative force of which is.
greatly weakened if not destroyed by the very hazy testimony
of the marshal himself as a witness for appellee. All things
considered, and after some hesitation, we are inclined to give
the company the benefit of the doubt in this regard.

Harold I. Sewall, president of the company and owner of
90 per cent of the stock, who lives in Naguabo within a few
miles of Humacao, testifies that as such president he received
no notice from the marshal as to the sale of the real estate;
that he was told by one Arés that the marshal had been on
the place and had talked about a levy, but without intimation
that the same might be against the company; that he was
told that a levy was attempted on the mules; that the com-
pany owned no mules; that the mules that were on the prem-
ises belonged to. the company; that he bought them for the
company with his money and that of the company; that if
he had stated in the municipal court that the mules belonged
to him and not to the company, it was a mistake; that he
removed the company's mules after the corporation ceased
to do business; that he did not state in the municipal court
that he had removed the mules because they belonged to him;
that he took them to his *finca* Antón Ruiz within the jurisdic-
tion of Humacao and did not notify the marshal. .

Eufemio Arés, a laborer, says that the marshal on one
occasion appeared and told him that he was going to levy on
the farm; that he was going to levy on account of a debt
that Sewall owed to Florencio García; that later he saw the
marshal again when he came with Juan Ortiz (purchaser
at the execution sale) to deliver possession; (on cross) that
the marshal said he was going to levy on the farm and that

later he came to give possession to Juan Ortiz; (redirect) that he was going to levy on the farm.

The marshal states that in addition to posting notices of the sale in several public places in Humacao he notified Sewall by mail; that he knows where the office of the company is; that it is "beyond Las Piedras"; that he went there and found an employee on the farm in charge thereof whom he also notified; that he notified Sewall by mail and sent him a copy of the writ; that not only did he write various letters but that he received no answer; that he does not know whether the letter is the one shown him by the attorney; that the first thing he did when he received the writ of attachment 'was to go to the *finca* and he found three mules that were pointed out to him and attached one of them which he believed would bring the amount; that the mule rebelled and did not want to leave the premises; that he had to leave it with Rivera, who was there instead of Arés in charge of the mules; that he could not carry out the sale because Sewell took the mule to Naguabo; that he heard that the mule did not belong to the company; that he suspended the attachment of the mule and levied on real estate; that there was no other personal property; that he knows about the mule because when he went back to look for it he did not find it, which was the reason why he levied on the land.

Both the marshal and the municipal judge also say that Sewall testified in the municipal court on the hearing of the motion to set aside the sale that the mule belonged to him and not to the company. It appears, however, that Sewall testified through an interpreter and it is a curious circumstance that his statement in the district court upon this point begins with the same assertion, which is contradicted by him in the next breath as well as by all the rest of his testimony, and that he was not called upon to explain this apparent discrepancy. If the examination in the municipal court was equally brief and haphazard, it is quite conceivable that the error was on the part of the interpreter. There is no direct

evidence that the mules did in fact belong to the company on the date when such testimony was given or on the date when Sewall removed them from the company property. It may be that at that time they belonged to Sewall and that the error arose from a mixing of tenses in translation. In any event the district judge in his decision on the merits does not question the veracity of the witness and, if it be true that Sewall testified in the municipal court long after the sale of the real estate that he had removed the mules because they were his property and not that of the company, it does not necessarily follow that they did not belong to the company on the date of the attachment, and, while such statement might have served to explain his action in taking the mules, it can hardly justify the abandonment of the property first attached by the plaintiff without any notice whatever of any conflicting claim of ownership.

"The common-law rule and practice on the levy of an execution is to remove the goods, and the fact that they are not removed is regarded as a badge of fraud, so as to render them liable to a subsequent execution, or to pass into the hands of a purchaser, discharged from the lien of the execution creditor. Likewise, although in the view of many authorities the continual presence of the attaching officer at the place where property attached lies is not necessary, the rule is that an officer cannot consistently with the preservation of the lien of an attachment constitute the debtor his agent to keep the chattels attached. Except so far as authorized by special statutory provision, therefore, he cannot leave such property with the debtor, without dissolving the attachment, and an attachment dissolved by reason of the possession of the property seized remaining with the debtor cannot be revived by notice." 17 R. C. L. p. 236, § 132.

Moreover, the testimony of the marshal does not make it at all clear that he ever went on the property after the writ of execution issued. While a portion of it is susceptible of that interpretation, yet, taken as a whole, it is equally compatible with the theory that when he failed to find the mules on his second visit he merely announced his intention of levying on the real estate at some future date and did not

return until he came to deliver possession to the purchaser at the execution sale. It is true that our statute provides that "in order to make a levy on immovable property it shall not be necessary for the officer to go upon the ground, but it shall be sufficient for him to endorse such levy on the writ, and he shall send the copy of such writ, with the endorsement thereon, to the registrar of property of the district wherein the property is situated, to be noted in the registry of property."

If in the case at bar the officer had sent the writ together with his return thereon to the proper registry of property, which, it is expressly conceded, he did not do, or if it were conclusively shown that he went upon the property after receiving the writ and made a levy in due form, we would be strongly inclined to affirm the order appealed from, notwithstanding the abandonment of the attachment levy. But he chose instead to substitute a notice by mail and apparently did not even take the precaution to register his letter in order to obtain the usual return receipt.

"It is a well-established rule that where there is a special statutory provision respecting the manner in which a levy of an execution or an attachment shall be made, it must be strictly observed, and that departure therefrom will invalidate the levy. Not only have very small irregularities in other respects been held fatal to the levy, but the courts have uniformly enforced strict observance of requirements designed to insure publicity and notoriety, and to preserve evidence of the time and circumstances of the levy. Thus, if the statute provides that the sheriff levying an attachment shall go to the place where the property of the defendant may be found, and declare in the presence of two residents of the county, who shall be attesting witnesses, that by virtue of the order he attached such property at the suit of the plaintiff, the statute is not complied with by a levy and declaration in the presence of two persons, one of whom is the plaintiff in attachment. Under more recent statutes prescribing some form of written or recorded notice in addition to or as a substitute for a declaration before witnesses, strict and entire compliance with the statutory requirements has been exacted. If the statute requires copies of a writ of attachment, a description

of the property and notice of the levy to be served on the occupant of the land attached, if there is one, and if none, the posting of such copies in a conspicuous place on the land, it is not a sufficient compliance with the statute to create a lien to serve such copies on the owner who is not an occupant of the land." 17 R. C. L. 199, § 98.

We do not deem it necessary to discuss at length the question of inadequacy of price as affecting the validity of the sale.

"A sale on execution is not void merely because the price paid for the property sold is inadequate, except, possibly, when so grossly inadequate as to create a presumption of fraud or reckless indifference on the part of the officer. * * * However, inadequacy of price may be evidence of fraud, especially when gross and when also, through a misapprehension as to their duty on the part of the persons employed to appraise the property sold, the appraised value is made unduly low. Where the price is inadequate, slight additional circumstances may be sufficient to induce the court to set the sale aside." 10 R. C. L. p. 1311, § 108.

Indeed, so trivial are the "slight additional circumstances" upon which some cases have turned that at least one trial judge has been moved to say that—

"the time has arrived when the hoary pretense of 'seizing upon other circumstances' might safely be sent to keep company with the many other useless fictions, that have been abandoned in the modern desire for a more straightforward administration of the law, and that the courts should admit that, when the price is grossly inadequate, that of itself is a valid reason for setting aside a sheriff's sale." *Stroup* v. *Raymond,* 38 Atl. 626.

Although this language was not approved on appeal in the case last cited and no appellate court as yet seems to have gone quite so far, nevertheless it is perhaps not too much to say that the general trend of modern decisions seems to point towards a possible, if not a probable, endorsement thereof at no very distant day. And while we do not find it necessary to commit ourselves to the same theory at this time, yet by reason of the fact that under our statute there

is no formal appraisement of property about to be sold under execution, and more especially because the right of redemption enjoyed by the judgment debtor in most jurisdictions and conferred by our legislature in 1904 was completely cut off by section 4 of an Act of March 9, 1905, which expressly repeals "Sections 259 to 266, both inclusive, of the Code of Civil Procedure, and all other sections thereof, in so far as they relate to the redemption of property sold at public sale," we are disposed to go quite as far as the more recently decided cases have gone in extending relief where valuable property has been sacrificed at a grossly inadequate figure. In this connection we may refer without comment to *Graffan* v. *Burgess,* 117 U. S. 180; *Schroeder* v. *Young,* 161 U. S 334; *Mullaney* v. *Cutting,* 154 N. W. 893, 894; *Odell* v. *Cox,* 151 Cal. 70, 76; *McCoy* v. *Brooks,* 80 Pac. 365; *Triplett* v. *Bergman,* 144 Pac. 899; *State ex rel. Reed* v. *Elliot et al.,* 90 S. W. 122; *Wertheimer-Swartz Shoe Company* v. *Wyble,* 170 S. W. 1128.

And as pointed out by the Supreme Court of Texas in *Chamblee* v. *Tarbox,* 84 Amer. Dec. 614, "it is not necessary, to authorize the interposition of the court, that these circumstances lead to the conclusion of actual fraud on the part of the purchaser. If the bargain is one which no man in his senses would make, and that no honest and fair man should accept, and there are circumstances attending the sale which may have operated to prevent the property from bringing a higher price, although at the time they may in fact have been unknown to the purchaser, the sale will be regarded by the court as, in its legal sense, fraudulent." See also *Baldwin Hardware Company* v. *Cleveland Building Company,* 53 Amer. St. Rep. 494.

However, as we have already intimated, there is another side to this case. The testimony of Sewall leaves much to be desired in many ways. He does not say that he had no knowledge of the impending sale, but that as president of the company he received no notice from the marshal; he

does not state positively that he was not informed of the levy, but that he was not advised that the levy was against the company. Neither his testimony nor that of Arés excludes the possibility, if not the probability, that he knew or had good reason to know what was about to occur. The judgment of the municipal court recites that the company, after being summoned, appeared, demurred and moved for a change of venue, and there is nothing to indicate why it permitted the judgment by default to be rendered against it or why it failed to keep advised as to the status of the litigation. The case as made, therefore, does not appeal to our sympathy so strongly as it might, had a full disclosure of the actual facts been made and had the facts so disclosed conclusively shown that the company was in no way to blame for the situation in which it now finds itself.

The company does not even tender the amount of the purchase price, and in order to collect some eighty odd dollars, appellee has been obliged to employ able counsel to represent him for more than five years during the course of this litigation, now before this court for the second time (see 23 P. R. R. 230), and the suit, apparently through no fault of the original plaintiff, gradually has attained a degree of importance out of all proportion to the paltry sum at first involved, if not, indeed, to the actual value of the real estate sold under execution.

In the circumstances, common justice demands that appellee be compensated in some measure for the great trouble and expense to which he has been put.

The ruling appealed from must be reversed and in lieu thereof the order of this court will be that if within ninety days from date hereof appellant deposit in the District Court of Humacao five hundred dollars out of which the purchaser at the execution sale is to be reimbursed to the amount of his bid with legal interest thereon to the date of such reimbursement and all court costs to date are to be covered, the balance to be paid over to plaintiff-appellee or his attorney

to compensate him in so far as may be for his annoyance, reasonable expenses, disbursements and attorney's fees incurred herein, then the writ of execution, levy and execution sale above mentioned shall be quashed, set aside and held for naught, otherwise the same shall stand and be and remain in full force and effect, the case being remanded for further proceedings not inconsistent herewith.

*Reversed and substituted.*

Justices Wolf and del Toro concurred.
Chief Justice Hernández and Justice Aldrey dissented.